## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

      Plaintiff,

      v.

                         Case No.  2:24-cr-20062-HLT

RAYMOND L. SMTIH,

      Defendant.

## MEMORANDUM AND ORDER

The Kansas Highway Patrol (KHP) received a report of a Liberty Fruit Company box truck driving erratically on the highway. A KHP trooper located a matching vehicle stopped behind a gas station and found Defendant Raymond L. Smith asleep at the wheel with the engine running. The KHP trooper woke Defendant and removed him from the vehicle. The KHP trooper ultimately arrested Defendant for driving under the influence. The KHP trooper then searched the box truck and recovered a defaced firearm. Defendant's cellphone was also recovered. Defendant later consented to a search of his cellphone, and incriminating evidence was located. A grand jury returned a single-count indictment charging Defendant with violating 18 U.S.C. § 922(g)(1).

Defendant now moves to suppress the evidence collected by KHP following the search of the box truck. Doc. 47. Defendant argues the warrantless search of the box truck and his cellphone violated his Fourth Amendment rights. The government argues that the search of the box truck didn't violate the Fourth Amendment because it was conducted incident to Defendant's arrest. It further argues that the search of Defendant's cellphone didn't violate the Fourth Amendment because Defendant consented to the search. The Court agrees with the government and denies Defendant's motion.

I.     BACKGROUND[1]

A.     Initial Report

KHP received a report at or around 7:00 a.m. on June 17, 2024, about a Liberty Fruit Company box truck driving erratically on the highway. The report indicated that the box truck was having difficulty maintaining its lane and that it had (or had nearly) collided with a barrier wall. Information about the vehicle's license plate number was also provided. KHP Master Trooper Clark Rials responded to the call and located the box truck in a gas station's parking lot in Lawrence, Kansas. Rials knew it was the box truck he was looking for because its license plate number matched what he had been given.

B.     Contact and Field Testing

Rials pulled in behind the box truck. Rials exited his vehicle and approached the box truck's driver's side door. He observed Defendant asleep in the driver's seat, slumped over the wheel. Rials announced himself and banged on the box truck's window. According to Rials, Defendant "jolted" awake and began frantically looking around the box truck's cab and toward its floor. Rials asked Defendant to cut the box truck's engine, which was still running.

Rials testified that Defendant's movements inside the cab were rapid. Rials believed Defendant was attempting to conceal something. And Defendant's movements were consistent, in Rials's experience, with individuals who are under the influence and impaired because of narcotics. Rials was concerned Defendant might also be armed. Rials had Defendant exit the box truck and walk toward its rear, which is where his police vehicle was parked.

---

[1]     The Court held an evidentiary hearing on October 6, 2025. The Court received exhibits and testimony from Keith Rogers, who is the transportation manager for Defendant's former employer, KHP Master Trooper Clark Rials, and AFT Special Agent Steven Waters. All three answered the questions put to them clearly and directly. All three appeared composed. The Court credits the testimony they offered.

Defendant stepped down from the box truck's elevated cab, faltering and bracing himself against its door. He then made his way unevenly toward the rear of the box truck. Rials followed him.[2] Video shows Defendant walking unsteadily.

Rials attempted to establish where Defendant had driven from and where he was headed. Defendant was confused about where he was, and his responses to the questions were given through slurred words. Defendant initially told Rials he was coming from "Kansas City" and "Kansas" and then that he was also headed toward "Kansas City." His answers did not make sense. Rials again asked Defendant where he was headed, and Defendant mumbled in response that "home" was his destination. Rials inquired as to the location of Defendant's "home." Defendant replied enthusiastically: "Right here. In Kansas City, Kansas!"

Rials pointed out to Defendant that he was, in fact, not in Kansas City but Lawrence. Defendant appeared untroubled by his evident confusion and laughed slightly. He then affirmed when asked again that he knew where he was. Rials then asked Defendant where the box truck's load was headed. Defendant replied, clumsily gesturing toward the truck, that he had "about 11 stops" to make "all over Lawrence."

Rials smelled alcohol coming from Defendant during the encounter. And he suspected Defendant was under the influence of something or possibly under the influence of a combination of alcohol and drugs. Rials had spent a portion of his career as a KHP trooper working an overnight shift and had numerous encounters with drivers who had pulled off the highway to sleep. Based on this experience, Defendant seemed more than simply tired. Rials asked Defendant if he'd had

---

[2]    Government's Exhibit 1 is video recorded by Rials's police vehicle's dash camera and audio recorded by Rials's body-worn microphone. The Court has reviewed this recording and includes its findings in this narrative.

anything to drink that morning or if he was on any medications or if he had consumed any marijuana or other narcotics. Defendant responded that he had not.

Rials then initiated a set of standard field sobriety tests directed at assessing whether Defendant was under the influence of an intoxicating substance. Rials performed three tests: horizontal gaze nystagmus, walk and turn, and one-leg stand. Defendant exhibited multiple signs of impairment across the tests. Rials testified that Defendant exhibited nystagmus (six out of six possible clues). Rials testified that Defendant exhibited all eight clues for the walk-and-turn test (e.g., he staggered, used his arms for balance, lost count of his steps, and failed to touch heel-to-toe). And Rials testified that Defendant exhibited three of the four clues for the one-leg stand test (e.g., swayed back-and-forth, used his arms for balance, and put his elevated foot down). Rials also observed that Defendant struggled to stand and walk and had difficulty maintaining a conversation and understanding basic instructions.

Rials concluded Defendant was impaired. Noting the extreme constriction of Defendant's pupils, Rials suspected that narcotics were involved. Rials believed from the totality of his observations during the encounter that he had probable cause to arrest Defendant for driving under the influences, which is a violation of K.S.A. § 8-1567.

Rials again asked Defendant about his recent alcohol consumption. Defendant told Rials that he had been drinking the prior evening but had likely had his last drink around midnight. Rials performed a preliminary breath test, which indicated that Defendant's blood-alcohol content was 0.091%. The "legal limit" in Kansas is 0.08%.

Rials arrested Defendant, seating Defendant handcuffed in his police vehicle. Rials noted that Defendant's pupils were extremely constricted—"pinpoint"—and asked Defendant whether

he had taken any pills. By this time, two other KHP troopers (Trooper Braun and Lieutenant Christianson) were at the scene.[3]

### C.    The Box Truck's Search

After Rials placed Defendant in his police vehicle, Rials explained to the other KHP troopers that Defendant's blood-alcohol content was 0.091%. Rials also explained that he suspected that Defendant had taken pills because of the constriction of Defendant's pupils. Braun agreed, remarking that Defendant was "definitely on something." Rials told Christianson that he intended to have Defendant take a blood test to confirm that Defendant had been driving over the legal limit. Rials further explained that he expected that the blood test would reveal evidence of other "drugs on board."

Christianson then walked up to the box truck's cab from the driver's side. Rials remarked to the Braun that he could "never get a normal DUI" and indicated that he intended to get Defendant's cellphone from the truck.[4] Rials stepped up to the box truck's cab on the passenger side, and Christianson walked back to Rials's vehicle to speak with Defendant. Christianson spoke with Defendant. He then returned to the box truck and asked Rials about Defendant's cellphone.

Rials had not located the cellphone when Christianson returned. He told Christianson the "first thing" he saw when he stepped up to the cab was a firearm in the front center console.[5] Rials then asked Christianson to locate the firearm's serial number and explained that Defendant had

---

[3]    Trooper Braun appears to have arrived at some point prior to administration of the field sobriety tests.

[4]    Rials testified that he will usually retrieve the cellphone of an individual he has arrested from his or her vehicle as a courtesy. Defendant's attorney asked how he could do this without conducting a search. Compassion among law enforcement officers for those they arrest is laudable. But it must not come at the expense of the officer's vigilant observation of that individual's constitutional rights. And a warrantless intrusion into areas in which an individual has a reasonable expectation of privacy (even for a laudable reason) generally violates the Fourth Amendment absent consent or another exception to the warrant requirement.

[5]    Rials testified that Christianson first saw the firearm. Rials also testified that Christianson was the one who initially collected it.

been "squirrely" and "reaching around" the box truck's cab during Rials's initial interaction with him. The cellphone was eventually located, and Christianson concluded that the firearm had no serial number.

Rials then left the scene with Defendant. They drove to Lawrence Memorial Hospital for a blood test. This process took the better part of an hour.

Rials then drove Defendant to the Douglas County Jail. Rials allowed Defendant to make multiple calls on his cellphone while enroute to the jail and while they sat in the jail's parking lot. Defendant spoke to multiple individuals. The conversations occurred over Defendant's cellphone's speaker and were captured by Rials's body microphone. Most of Defendant's conversations were anodyne and involved logistical issues relating to Defendant's ability to get a bond and secure transportation from the jail. But Rials did find suspicious statements made during Defendant's conversation with an individual who seemed to be Defendant's girlfriend (or ex-girlfriend). During the call, Defendant's girlfriend told Defendant that he knew that he needed to break his cellphone. This statement made Rials suspect that Defendant's cellphone contained evidence of criminal activity.

### D.    Interview and the Cellphone's Search

Because Defendant had a prior felony conviction, ATF got involved. ATF Special Agent Steven Waters responded to the Douglas County Jail and made contact with Rials and Defendant. Defendant was lying on a bench in the jail's booking area and appeared to be sleeping when Waters arrived. Defendant was uncuffed at the time. Rials and Waters woke Defendant and directed him to a separate room for an interview. Defendant was able to walk to the room without assistance. Defendant remained unrestrained, and the door to the room was closed but unlocked. The room

was relatively small. Defendant was seated. Waters and Rials stood within two to three feet from him.

Waters took the lead during the interview. He asked Defendant if he could understand English and advised Defendant of his rights. Waters also identified himself verbally and through his credentials. Waters knew Defendant had been arrested for driving under the influence. Waters asked Defendant several questions to assure himself that Defendant could understand and answer questions appropriately. Waters believed based on his training and experience that Defendant understood the questions and was "oriented." Defendant waived his right to silence and spoke with Rials and Waters. Nothing during the interview made Waters suspect that Defendant remained under the influence to such an extent that he could not consent to a search.

Waters asked Defendant if he could obtain a sample of his DNA through a buccal swab. Waters explained that they would compare the sample against the firearm recovered from the truck. Waters emphasized that it was Defendant's choice to consent or not. But Waters also explained that he'd have to get a warrant if Defendant did not consent. Waters reassured Defendant that it would be "perfectly fine" if Defendant didn't consent, that it was within Defendant's rights not to, and that he would not "take it personally" were consent not given. Defendant agreed to the swab.

Waters also asked Defendant if he could search his cellphone. Defendant asked Waters whether he was going to get a warrant for the cellphone search. Waters answered that he would have to apply for a warrant for that as well. Defendant then asked Waters what he was looking for, and Waters explained that he was, in essence, looking to see whether there was anything in the cellphone that contradicted either Defendant's claim that he had not been using drugs or his insistence that he didn't know about the firearm's presence in the truck. Defendant consented to

the cellphone search, telling Waters to "go for it." Defendant then provided the password to the cellphone and helped Waters place it in "airplane mode."

Waters testified at the suppression hearing, and the audio recording of the interview confirms, that he did not raise his voice at Defendant and did not threaten Defendant. Waters also testified that he did not intrude into Defendant's physical space. In Waters's estimation, which is consistent with the Court's own review of the interview's audio, the interview was "cordial."

Waters took Defendant's phone and had the contents imaged with software called Cellbrite. Waters testified that it is standard practice to conduct searches of cellphones on imaged copies of their contents rather than on the actual device. Waters explained that searching through an imaged copy reduces the risks of altering anything about the phone or changing the metadata of its files. The imaging was done overnight, and Defendant's cellphone was returned to him around June 20.

Waters received an imaged copy of the phone on June 18 and discovered in short order an image of a firearm that appeared similar to the one seized from the box truck. A complete forensic analysis of the cellphone's contents had not been conducted by the time the cellphone was returned to Defendant. The subsequent forensic analysis revealed additional evidence of Defendant's firearm possession and drug use.[6]

At no point did Defendant try to limit the scope of or revoke his consent to the cellphone's search. Waters testified that evidence of things like drug use and firearm possession can be found in diverse locations throughout a cellphone, agreeing when asked by the government that evidence could be "sprinkled throughout a large area of the phone." Waters testified that, based on his experience, this sort of evidence is found in text messages or in pictures or videos. But he further

---

[6]    That analysis also uncovered evidence of other contraband. Once this other contraband was discovered, ATF's search of the cellphone ended. A search warrant was obtained from the Western District of Missouri to search the device download for evidence concerning the sexual exploitation of minors and child pornography.

testified that evidence could also be found, for example, by looking at application data, data from Google Maps, Venmo, and a cellphone's calendar.

## II.    ANALYSIS

Defendant moves to suppress evidence collected following the search of the box truck. He argues that the warrantless search of the box truck violated the Fourth Amendment because the government has not shown an exception to the warrant requirement. Defendant additionally argues that the warrantless search of his cellphone violated the Fourth Amendment because the government has not shown that his consent was knowing and voluntary.

The government responds that the search of the box truck is valid as a search conducted incident to Defendant's arrest for driving under the influence and that Defendant's consent to the search of his cellphone was knowing and voluntary. The Court agrees with the government on both issues as explained below and denies the motion.[7]

---

[7]    The government also argues that Defendant lacks Fourth Amendment "standing" to object to the search of the box truck. "Standing" in the Fourth Amendment context refers to the idea that Fourth Amendment rights are personal and that they cannot be asserted vicariously. *Byrd v. United States*, 584 U.S. 395, 410-11 (2018). The term refers to a substantive part of Fourth Amendment jurisprudence and does not affect a court's jurisdiction. *Id.* The Court therefore does not have to address it before taking up the "merits" of Defendant's suppression argument, which merits ultimately fail and render resolution of standing unnecessary. *Id.*

But the Court registers some doubt as to the viability of the standing argument. The heart of the government's standing argument is that Defendant had no right to object to the search of the box truck because the box truck was his employer's (not his) and Defendant had agreed to a company policy that effectively eliminated any expectation of privacy in the box truck that he may have had while on the job. The government relies on *Zorn v. City of Marion, Kansas*, 774 F. Supp. 3d 1279, 1315-16 (D. Kan. 2025), a case in which it was concluded that a private employer's workplace privacy policy eliminated any Fourth Amendment protected privacy interest an employee might have had in the employer's property.

True, Defendant in this case might have disclaimed a privacy interest as against his private employer. But unlike the *Zorn* court, this Court doesn't view this fact as particularly important to the analysis. The Supreme Court held long ago in *Mancusi v. Deforte* that a private sector employee can have a protected Fourth Amendment privacy interest in their employer's property notwithstanding the employer's own right to access it. 392 U.S. 364, 369-70 (1968). Which is to say, "one's personal office is constitutionally protected against warrantless intrusions by the police, even though employer and co-workers are not excluded." *O'Connor v. Ortega*, 480 U.S. 709, 730 (1987) (Scalia, J., concurring in the judgment).

*Zorn* doesn't cite *Mancusi* or acknowledge it. It instead relies on Tenth Circuit authority that concerns the expectations of privacy public sector employees enjoy against government intrusion in light of workplace policies maintained by their government employers. *See* 774 F. Supp. 3d at 1315 (discussing *United States v. Angevine*, 281 F.3d 1130 (10th Cir. 2002)). *Angevine* is express that its analysis specifically concerns "public employees'

#### A.        Search Incident to Arrest

The first issue the Court takes up is whether the warrantless search of the box truck was reasonable under the Fourth Amendment. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Warrantless searches are "per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (internal quotation and citation omitted).[8] One exception to the requirement is the "search incident to a lawful arrest." *Id.* The search-incident-to-arrest exception "derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations." *Id.* An officer is permitted under the exception to search a defendant incident to an arrest when the officer knows facts giving him probable cause to arrest the defendant for any crime. *See United States v. Sanchez*, 555 F.3d 910, 922 (10th Cir. 2009). This is an objective standard. *Id.*

But probable cause to arrest does not give rise to an unlimited entitlement to search. When a search incident to an arrest occurs, there are limitations on what and where may be searched and when. And, in the automobile context, a vehicle search can occur incident to an arrest only if the "arrestee is unsecured and within reaching distance of the passenger compartment at the time of

---

expectations of privacy." 281 F.3d at 1134 (internal quotation, citation, and alteration omitted). To the extent a workplace policy drove *Zorn*'s conclusion that no Fourth Amendment privacy interest attached, the Court disagrees with its reliance on *Angevine*.

That said, none of these cases – whether *Zorn* or *Mancusi* or *Angevine* – concerns the effect a private employer's workplace policies might have on an employee's Fourth Amendment privacy interests in the automobile context. And because individuals' privacy expectations are already diminished in this context, it's not wholly inconceivable that there could be certain cases where this distinction drives a meaningful difference in outcome.

[8]   Whether the exceptions are few or many is in the eye of the beholder. Justice Scalia famously lamented over 30 years ago that the "warrant requirement had become so riddled with exceptions that it was basically unrecognizable." *California v. Acevedo*, 500 U.S. 565, 582-83 (1991) (Scalia, J., concurring).

the search," or if "it is reasonable to believe evidence of the crime of arrest might be found in the vehicle." *Gant*, 556 U.S. at 343 (internal quotations, citation, and footnote omitted).

In this case, there is no dispute that the firearm was found and seized during the search of the box truck, that the search occurred without a warrant, and that probable cause to arrest Defendant for a violation K.S.A. § 8-1567 existed. There is also no dispute that Defendant was secured and well out of arm's reach of the box truck's cab at the time the search occurred. The point of contention is whether there was reason to believe that evidence of Defendant's violation would be found in the box truck's cab.

Defendant argues that Rials and Christianson could not have had reason to believe that evidence of alcohol consumption would be found in the box truck because all they had to go on were the results of a field sobriety test. A problem with this argument is that it only works if Rials lacked probable cause to arrest Defendant for anything other than K.S.A. §§ 8-1567(a)(1) through (a)(3), all of which are specific prohibitions on driving under the influence of <u>alcohol</u> (and alcohol only). But Kansas law doesn't just criminalize driving under the influence of alcohol. Section 8-1567 contains other subsections that criminalize driving under the influence of drugs or combinations of drugs and alcohol. *See* K.S.A §§ 8-1567(a)(4) through (a)(5). And Rials had probable cause to believe that Defendant was driving under the influence of a drug-alcohol combination.

Rials made multiple observations that objectively support a conclusion that Defendant was under the influence of both drugs and alcohol. Defendant's obvious confusion and significant physical impairment clearly indicated Defendant was intoxicated. The smell of alcohol coming from Defendant, Defendant's admission that he'd consumed alcohol the night before, and the 0.091% preliminary breath test result all support the conclusion that Defendant's intoxication was

due at least in part to alcohol consumption. But Rials also reasonably attributed the extreme

constriction of Defendant's pupils and his rapid and erratic movements in the box truck's cab to

narcotics. It was also reasonable for Rials to conclude based on his overall observations and

Defendant's breath test—the results of which were close to the 0.08% legal limit—that alcohol

wasn't the only substance contributing to Defendant's intoxication.[9] The "facts and circumstances

within [Rials's] knowledge and of which he . . . had reasonably trustworthy information" were

"sufficient to lead a prudent person to believe" that Defendant had been driving under the influence

of a combination of drugs and alcohol. *See Beck v. Ohio*, 379 U.S. 89, 91 (1964). There was, in

other words, probable cause to arrest Defendant for driving under the influence of a combination

of drugs and alcohol, a violation of K.S.A § 8-1567(a)(5).

There was also reason to believe that evidence of Defendant's violation of § 8-1567(a)(5)

would be found inside the box truck. Rials testified that when he first got Defendant's attention,

Defendant was reaching around the cab frantically and looking down toward its floor. Rials

testified that based on his experience these movements were consistent with an attempt to conceal

something, possibly drugs or other contraband. This supplied Rials with one reason to believe that

Defendant's intoxication was the result of drugs that were concealed in the truck. That Defendant

was intoxicated from whatever substances were in his system provided another: It was objectively

reasonable for Rials to have suspected that whatever it was Defendant had taken, he had taken it

---

[9]  Based on the Court's review of Government's Exhibit 1, this seems the clear implication of Rials's exchange with Christianson and Braun immediately after Defendant's arrest. Christianson asked Rials about the results of the breath test. Rials notes the result and then explained his belief that Defendant had ingested drugs. And Braun, who had been present for at least a portion of Defendant's field sobriety test, agreed with this assessment. Rials also noted that if the results of a subsequent test of Defendant's blood indicated a blood-alcohol content below 0.08%, the test would reveal what other drugs Defendant had "on board" (i.e., in his system).

recently enough for him to still be intoxicated.[10] The search of the box truck's cab was a valid

search incident to Defendant's arrest.[11]

### B.    Consent to Search

The Court next addresses whether Defendant voluntarily consented to his cellphone's

search and whether the ATF's search exceeded the scope of that consent.

**Voluntariness of the Search.** Another exception to the warrant requirement is a suspect's

voluntary consent. *United States v. Harrison*, 639 F.3d 1273, 1278 (10th Cir. 2011). This consent

must "not be coerced, by explicit or implicit means, by implied threat or covert force." *Id.* (internal

quotation and citation omitted). And "there must be clear and positive testimony that the consent

was unequivocal and specific." *United States v. Gay*, 774 F.2d 368, 376 (10th Cir. 1985) (citation

omitted). Whether a suspect has voluntarily consented to a search or was coerced into doing so is

"a question of fact to be determined from the totality of all the circumstances." *Harrison*, 639 F.3d

at 1278 (internal quotation and citation omitted). Some "[r]elevant considerations" in this respect

include:

> physical mistreatment, use of violence, threats, promises,
> inducements, deception, trickery, or aggressive tone, the physical
> and mental condition and capacity of the defendant, the number of
> officers [present], and the display of police weapons. Whether an
> officer reads a defendant his *Miranda* rights, obtains consent
> pursuant to a claim of lawful authority, or informs a defendant of his
> or her right to refuse consent also are factors to consider in

---

10    Rials suspected based on Defendant's behavior that he had taken an opioid. But he testified at the suppression hearing that a multitude of factors can affect how quickly a drug is metabolized and a drug's intoxicating effects dissipate.

11    The Court notes that Christianson's involvement in the search does not meaningfully affect this analysis because of the "collective knowledge doctrine." "Police work often requires officers to rely on the observations, statements, and conclusions of their fellow officers. An officer who [for instance] is called to the scene to conduct a search incident to arrest is not required to reevaluate the arresting officer's probable cause determination . . . ." *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1260 (10th Cir. 1998). Rials communicated his belief that Defendant was under the influence of narcotics and shared the relevant information supporting that conclusion with Christianson and Braun.

> determine whether consent given was voluntary under the totality of
> the circumstances.

*Id.* (citation omitted). That a suspect is in custody at the time consent is given is also a non-dispositive factor. *United States v. Romero*, 247 F. App'x 955, 963 (10th Cir. 2007). Here, the government has the burden of proving that Defendant's consent was voluntary. *See id.* at 962.

The Court finds that the government has produced evidence establishing that Defendant voluntarily consented to the search of his cellphone. Defendant, without equivocation, unambiguously agreed to the cellphone's search, telling Waters to "go for it." True, Defendant was in custody when he consented. But he was unrestrained, and he was in a room where there were at least a couple of feet of separation between him and Waters and Rials. The room's door was closed but unlocked. Waters advised Defendant of his rights before Defendant consented. The interview's audio recording indicates that Waters's interaction with Defendant was nonconfrontational. Waters didn't berate, browbeat, or raise his voice at Defendant during the interview. There was also no evidence of physical coercion or duress. No threats, either implicit or explicit, were made. Waters honestly told Defendant that Waters would have to apply for a search warrant if Defendant refused consent. But Waters did not suggest that refusal would have punitive consequences. Waters told Defendant that it was within his rights to refuse consent. Waters also told Defendant what he intended to search for on the cellphone.

To be sure, Defendant had been arrested only hours before in an obviously intoxicated state for driving under the influence, and this certainly weighs in the analysis. But the circumstances under which Defendant consented overwhelmingly indicate that his consent was voluntary. As a result, the fact of Defendant's intoxication does little to suggest consent was involuntary. After all, sobriety isn't required, but neither is complete lucidity. *See United States v. Luna-Santana*, 128 F. App'x 42, 47-48 (10th Cir. 2005). Instead, "there are different degrees of intoxication" and a

person "can be too intoxicated to operate a motor vehicle, but rational enough to understand requests." *Gay*, 774 F.2d at 377. What matters for purposes of assessing the voluntariness of Defendant's consent is that Defendant seemed oriented and could understand what Waters was asking of him. *See Luna-Santana*, 128 F. App'x at 47-48. And the audio recording of Defendant's interview and Waters's testimony indicate Defendant was oriented and could understand. The Court concludes that the government has provided sufficient evidence to show that Defendant's consent was voluntary under the totality of the circumstances.

**Scope of the Search.** The Court's conclusion that Defendant voluntarily consented to his cellphone's search does not end the analysis. Even when consent is given, a search might still run afoul of the Fourth Amendment if it exceeds the consent's scope when executed. The general rule is that "[t]he scope of a search is . . . defined by its expressed object and is limited by the breadth of the consent given." *United States v. Elliott*, 107 F.3d 810, 814-15 (10th Cir. 1997) (internal quotations and citations omitted). And an "objective reasonableness" standard (i.e., what "the typical reasonable person [would] have understood by the exchange between the officer and suspect") is used to "measur[e] the scope of an suspect's consent." *Id.* at 815.

Defendant insists his cellphone's search was unlawful because he did not consent to an imaging of all its contents. In Defendant's view, his consent was implicitly limited to the places in his cellphone where evidence relating to potential drug use and firearm possession would have been located. This is what Waters said he was searching for, and this is what Defendant agreed to let Waters search. Defendant argues that the generation of a complete image of his cellphone's contents—which made no distinction between data potentially containing evidence and data that did not—fell beyond the scope of that agreement.

Defendant's argument is unpersuasive. The unique difficulty posed by searches of digital devices for evidence of particular crimes is that responsive data "could be stored anywhere." *United States v. Palms*, 21 F.4th 689, 700 (10th Cir. 2021). Acknowledging this difficulty, the Tenth Circuit has instructed district courts assessing whether such searches are reasonable in scope to focus on "<u>how</u>" they are "conducted rather than [on] <u>what</u> was searched." *Id.* This "shift[ in] focus in this way is necessary in the electronic search context" because there may not be any restrictions placed "on where <u>within a computer</u> or other electronic storage device the government is permitted to search." *Id.* With this framework in mind, the Tenth Circuit has explicitly blessed searches conducted by imaging the storage media searched even though the process necessarily captured information beyond the permissible scope of the search. *Id.* (discussing *United States v. Burgess*, 576 F.3d 1078, 1083 (10th Cir. 2009)). "Broad extractions" of this sort are "consistent with the reality that evidence of the crime [being investigated] could be found in various file types," whether "text messages, emails, photographs, [or] internet history." *Id.*

The situation is no different here. Waters testified during the hearing that the sorts of evidence he sought could have been found in myriad places in Defendant's cellphone and could have taken many different forms, such as text messages, photographs, or even application-specific transaction data from applications like Venmo. Defendant, himself, did not place any restrictions on where in his cellphone the government could search or what file types it was permitted to look at. Nor did he ever revoke his consent to the government's search. In light of this, the government's use of imaging software to extract and copy Defendant's cellphone's contents before searching was not unreasonable and did not exceed the scope of Defendant's consent. *Cf. id.* at 701 (concluding that the "physical extraction of all the data from [a] cellphone was reasonable" during

a search pursuant to a warrant because "the warrant did not limit the search to one type of information contained in the phone" and the evidence sought "could have taken many forms").

In sum, Defendant's consent to the cellphone search was voluntary, and the search did not exceed the scope of that consent.

## III.    CONCLUSION

Defendant's motion to suppress (Doc. 47) is denied because the warrantless search of the box truck was incident to his arrest and because his consent to search his cellphone was knowing and voluntary.

THE COURT THEREFORE ORDERS that Defendant's motion to suppress (Doc. 47) is DENIED.

IT IS SO ORDERED.

Dated: November 6, 2025                    /s/ *Holly L. Teeter*
                                           HOLLY L. TEETER
                                           UNITED STATES DISTRICT JUDGE